SIERRA CLUB, Northern Alaska Environmental Center, Wilderness Society, Birch Creek Village Council, Minto Village Council, Golovin Traditional Council, Nunam Kitlutsisti, and Cenaliulriit Coastal Management District, Plaintiffs,

v.

Michael PENFOLD, Director of the Alaska State Office of the Bureau of Land Management, Donald P. Hodel, Secretary of the Interior, Robert F. Burford, Director of the Bureau of Land Management, Donald E. Runberg, Acting District Manager of the Fairbanks District Office of the Alaska State Office of the Bureau of Land Management, Wayne A. Boden, District Manager of the Anchorage District of the Alaska State Office of the Bureau of Land Management, Department of the Interior, and Bureau of Land Management, Defendants,

Alaska Miners Association, Miners Advocacy Council, Valdez Creek Group, and Joseph Vogler, Defendants-Intervenors.

Resource Development Council for Alaska, Inc., Amicus Curiae.

No. A86–083 Civil.

United States District Court,
D. Alaska.

May 14, 1987.

Second Memorandum May 28, 1987.

Injunctions July 21, 1987.

Robin Rivett, James Burling, Fred Slimp II, Pacific Legal Foundation, Sacramento, Cal., for Alaska Miners Assoc.

Thomas Wickwire, Fairbanks, Alaska, for Joseph Vogler.

## MEMORANDUM AND ORDER ON CUMULATIVE IMPACT CLAIMS

VON DER HEYDT, District Judge.

This matter is before the court on the motions and briefing of the parties relating to paragraph 43 of the Amended Complaint. In the discussion that follows, the court will refer to federal defendants collectively as "BLM," and to the Alaska Miners Association and the Miners Advocacy Council collectively as "AMA."

### A. *Summary*

This ruling relates to BLM's approval of placer mining operations disturbing more than five acres of federal land within the Birch Creek watershed. Birch Creek is a National Wild River rising near Eagle Summit on the Steese Highway. Under the National Environmental Policy Act (NEPA), BLM is required to study the cumulative impact of the numerous placer mining operations that contribute incrementally to siltation and other environmental degradation within the Birch Creek corridor. BLM has systematically ignored this obligation. The court will therefore order BLM to prepare an Environmental Impact Statement for the watershed, addressing the issue of cumulative impacts. Once the 1987 mining season has ended, no mines disturbing more than five acres will be allowed to operate until BLM completes the required preliminary study.

### B. *Facts*

Uncontroverted evidence shows that when Birch Creek was first evaluated for inclusion in the National Wild and Scenic Rivers System, it had good water quality throughout its length, with the upper reaches described as "very clear." FEIS for Proposed Birch Creek National Wild River (1975), at 28. The water quality, combined with the availability of road ac-

Lauri J. Adams, Philip S. Barnett, Sierra Club Legal Defense Fund, Inc., Juneau, Alaska, for plaintiffs.

Lewis Gordon, Anchorage, Alaska, for Wilderness Society.

Dean Dunsmore, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

cess above and below the river segment at issue in this lawsuit, provided a recreational opportunity "unique ... in Alaska." *Id.* at 48. At that time, Birch Creek was one of the state's most popular float rivers. H.R.Rep. No. 96–97, 96th Cong., 1st Sess. pt. 1 at 197 (1979). Nonetheless, BLM projected that classification as a Wild River would lead to much greater recreational use, totalling 10,700 visitor-days per year. Birch Creek N.W.R. FEIS at 50.

Congress designated 126 miles of Birch Creek a Wild River on December 2, 1980. Wild and Scenic Rivers Act, as amended by Alaska National Interest Lands Conservation Act (ANILCA) § 603, 16 U.S.C. § 1274(a)(46). Congress has defined Wild Rivers as "outstandingly remarkable," representing "vestiges of primitive America," with "waters unpolluted." 16 U.S.C. §§ 1271, 1273(b)(1). Congress's declared policy is that these rivers be protected from pollution and from degradation of esthetic and scenic values. 16 U.S.C. §§ 1271, 1281(a), 1283(c).

The 1979–80 surge in gold prices brought a corresponding surge in placer mining within the Birch Creek watershed.[1] Final Environmental Statement—Protection of River Corridors (1980), at IV-4. This surge has resulted in a degradation of water quality. *E.g., id.,* Summary at 2. Though gold prices have since declined somewhat, the heightened level of placer mining activity has continued. Dames & Moore (for Alaska Dep't of Environmental Quality), A Water Use Assessment of Selected Alaska Stream Basins Affected by Placer Gold Mining (1986), at 3–29 to 3–30.

The effect of placer mining on the Birch Creek Wild River is carefully documented in the Dames & Moore study, whose findings are entirely uncontroverted.[2] The study shows that nearly all mines in the watershed add incrementally to sediment load, resulting in "sediment concentrations ... an order of magnitude higher than would be expected during the period before mining." *Id.,* Summary at 4 and passim. Deadwood Creek, a tributary of the Wild River portion of Birch Creek, provides an example of the effect of mining on quality of waters draining into the Wild River corridor. Water above all mining carries just 3.4 milligrams of suspended solids per liter. After passing through a group of mines—a number of which operate on BLM land under Plans of Operations—the sediment load rises to 1556 mg. per liter, a load that exceeds state water quality standards for such a creek by two orders of magnitude. *Id.* at Table 3–N; *see* Alaska Admin.Code Tit. 18, §§ 70.020(b)(1), 70.050(a); Barnett Declaration Exh. A (Pl.P.I.Exh. 7). Concentrations below any group of mines diminish as the distance from the mines increases, but it is apparent that some effect persists many tens of miles downstream. The net effect of mining on Birch Creek is that the Wild River has greatly elevated turbidity levels throughout its length. Dames & Moore, *supra;* Alaska Dep't of Fish and Game, Aquatic Habitat Assessments in Mined and Unmined Portions of the Birch Creek Watershed (1985), at 42; Steese Resource Mgmt. Plan FEIS at 110. Placer mining has also significantly altered water chemistry in portions of the watershed. Dames & Moore at 3–91 to 3–94.

Uncontroverted studies show that this decline in water quality has "greatly reduced" fish populations in Birch Creek. ADFG, Aquatic Habitat Assessments at 41–42; *see also* Dames & Moore at 3–94 to 3–107.[3] Indeed, the river appears to be practically barren. The dramatic reduction in water quality has also deterred recreational use, which has not approached the

---

**1.** As used in this opinion, "Birch Creek watershed" refers only to streams emptying into the portion of Birch Creek designated a Wild River.

**2.** Certain AMA exhibits that might appear to controvert aspects of the Dames & Moore study are not admissible to show the truth of the matters they assert. *See, e.g.,* this court's Memorandum and Order dated October 15, 1986, at

15 (addressing AMA Exhibit 15). Others have been stricken. *E.g., id.* at 13.

**3.** AMA Exhibits 17.5, 17.10, and 17.18, cited in AMA's brief, do not relate to the Birch Creek basin. No affidavit included in AMA Exhibit 17 addresses fish populations in the Wild River corridor.

levels originally projected for the Wild River.[4] Dames & Moore at 3–35 to 3–38.[5]

In 1985, about sixty placer mines operated on BLM land in the Birch Creek watershed. This number appears to encompass the vast majority of mines in the basin, although there are a few mines that operate on non-BLM land. Compare Barnett Declaration (Pl.P.I.Exh. 7) *with* Dames & Moore at 3–31 *and* AMA Exhibit 17. Twenty-three of the mines on BLM land operated under Plans of Operations (reflecting a disturbance of more than five acres per year) and required BLM approval pursuant to 43 C.F.R. § 3809. The remainder fell below the five-acre threshold and operated under Notices. *See* 43 C.F.R. § 3809.1–3. Mines under Plans of Operations contributed to the degradation of water quality in Birch Creek. *Compare, e.g.,* AMA Exhibits 17.2 (Goldust Mines) and 17.7 & appendices (GHD) *with* Dames & Moore at Table 3–N.

The foregoing review of the facts is not intended to suggest that the environmental degradation caused by placer mining is improper. Mining may produce benefits that outweigh the harm it causes. What the facts demonstrate, and what is relevant to the holding that follows, is that the large number of mines in the Birch Creek watershed have a cumulative effect on the Wild River that is significant. Operations subject to BLM approval contribute to this cumulative effect.

C. *Application of Legal Standard*

■ The National Environmental Policy Act[6] and implementing regulations require that "when several proposals for ... actions will have cumulative or synergistic environmental impact, ... their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427

U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *see also* 40 C.F.R. § 1508.25. Although the Act relates only to "federal" actions, analysis of the cumulative impact of any federal action[7] has a broader scope:

> 'Cumulative impact' is the impact on the environment which results from the incremental impact of the [federal] action when added to other past, present, and reasonably foreseeable future actions *regardless of what agency (Federal or non-Federal) or person* undertakes such other actions.

40 C.F.R. § 1508.7 (emphasis added). If, when these cumulative or synergistic impacts are analyzed, there are "substantial questions" as to whether the impacts may be collectively significant, an Environmental Impact Statement (EIS) must be prepared. *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir.1985). This is so even if the actions are "individually minor." 40 C.F.R. § 1508.7.

■ The facts of the case at bar raise two central questions. First, are the impacts of the sixty or more placer mines in the Birch Creek watershed related in such a way as to require unified analysis under NEPA? The answer is plain: if ever there was a paradigm instance of "cumulative" or "synergistic" impacts, it is this case. Dozens of small operations of a single type incrementally contribute to deterioration of water quality in a common drainage stream. *Cf. N.R.D.C. v. Callaway*, 524 F.2d 79, 87–89 (2d Cir.1975) (successive dumpings into same area of ocean); *Manatee County v. Gorsuch*, 554 F.Supp. 778, 793 (M.D.Fla.1982) (same); *National Wildlife Federation v. Benn*, 491 F.Supp. 1234, 1248–52 (S.D.N.Y.1980) (same). A large percentage of the operations require periodic BLM approval; BLM receives formal

---

**4.** In evaluating the cumulative impacts issue, the court has limited its consideration to impacts within the Wild River corridor caused by placer mining in the watershed (which occurs outside the corridor). The court has not considered localized effects of mining, such as removal of vegetation and alteration of stream channels, that are confined to lands outside the corridor.

**5.** Note that the figures in Table 3–C are for the basin as a whole, rather than for the corridor.

**6.** 42 U.S.C. § 4321 *et seq.*

**7.** The twenty-three mining operations in the watershed approved pursuant to 43 C.F.R. § 3809.-1–6 are, of course, "federal actions" for purposes of NEPA. 40 C.F.R. § 1508.18(a).

notices describing most of the remainder. While the operations are not functionally or economically interdependent, their impacts are interdependent and require common analysis. *See Fritiofson v. Alexander,* 772 F.2d 1225, 1241 n. 10 (5th Cir.1985); *Cady v. Morton,* 527 F.2d 786, 795 (9th Cir.1975); Barney, *The Programmatic Environmental Impact Statement and the National Environmental Policy Act Regulations,* 16 Land & Water L.Rev. 1, 10–11 (1981).

■ Equally straightforward is the second question: is there at least a substantial possibility that the collective impact of mining in the watershed is "significant" within the meaning of NEPA? In answering this question, one must bear in mind Birch Creek's status as a National Wild River and its unique recreational potential. At the risk of belaboring the obvious, the court holds that the transformation of the entire 126–mile length of such a river from a clearwater stream to a silt-laden one is a significant environmental event. The evidence that mining has brought about this event is uncontroverted.[8]

D. *Steese Resource Management Plan EIS*

■ Although BLM contends that no analysis of cumulative impacts is necessary, it also maintains that it has already performed such an analysis as part of the 1984 EIS reviewing the Proposed Resource Management Plan for the Steese National Conservation Area. The Conservation Area encompasses about three-fifths of the Birch Creek Wild River corridor, but only nine of the more than sixty mines active on BLM land in the Birch Creek watershed in 1985. Barnett Declaration Exh. A, *supra;* Steese RMP FEIS at 110. The most heavily placer-mined tributaries are located outside the Conservation Area.

The Steese Resource Management Plan EIS was never intended to focus on the cumulative impacts of BLM approvals of mining plans in the Birch Creek watershed. Indeed, it borders on the absurd to suggest that a study encompassing only one-seventh of the relevant mines could fulfill this role. While the Steese EIS may be entirely adequate for its intended function—to review alternative plans for management of the Conservation Area—it simply cannot be stretched to perform the additional function invented by BLM's lawyers in an effort to defend this suit.

E. *Ripeness*

BLM seeks dismissal of plaintiff's cumulative impact claim on the ground that it is not ripe for review. Although ripeness is a preliminary issue, the court has delayed its discussion until this juncture to avoid a repetitive opinion.

The question of ripeness depends, in large measure, on the kind of ruling the court will be required to make on the merits. It is "a two-fold inquiry evaluating the hardship to the parties of withholding judicial determination and evaluating whether the issues are fit for judicial determination." *Seafarers International Union v. Coast Guard,* 736 F.2d 19, 26 (2d Cir.1984). The latter inquiry turns on pragmatic considerations, including whether an adequate administrative record has been developed and whether the issues presented are primarily legal rather than factual. *Id.* The court has previously dismissed a number of plaintiffs' other claims on the grounds that they required development of an unwieldy factual record with respect to hundreds of individual mines, that relief would have to be specific to individual mines, and that plaintiffs' claims could be pursued more

---

**8.** Even if this evidence were not uncontroverted, plaintiffs might be entitled to summary judgment. The interplay between the standard for granting summary judgment and the "substantial questions" threshold for triggering NEPA, *see Thomas, supra,* is complex. For example, if uncontroverted evidence showed the *existence* of studies or comments indicating a significant effect on the human environment, the existence alone of those studies or comments could entitle plaintiffs to summary judgment, even if their conclusions were controverted to some degree. Whether this would be so would depend on the content of the studies, their source (studies or comments of government agencies would be especially significant), and the nature of the controverting material. The court would have to evaluate whether the very existence of the studies showed, beyond doubt, that substantial questions had been raised. *See id.* at 759.

appropriately through case-by-case administrative appeals.[9] Memorandum and Order filed November 21, 1986, at 14–17.

■ The cumulative impact claim is very different. Plaintiffs are challenging a longstanding and completely uniform BLM practice of approving operations under Plans of Operations without assessing their cumulative impacts.[10] Such a uniform practice can constitute reviewable final agency action. *Benn, supra,* 491 F.Supp. at 1241–42. Administrative appeal would not be practical; to obtain the relief they seek administratively, plaintiffs would have to file appeals on every mine approval in the Birch Creek watershed. This would impose some hardship on plaintiffs and delay relief.[11] In contrast, the court can dispose of this claim in a single proceeding. Operating from a manageable factual record relating to broad rather than local impacts, the court is asked to rule on a broad legal question. Indeed, the claim at issue here is practically identical to the one entertained in *Benn.* The court holds that the cumulative impact claim is ripe for review.

### F. *Remedy*

■ Where an agency's decision not to prepare an EIS is flawed by inadequate explanation or faulty reasoning, the usual procedure is to remand the matter to the agency for further consideration of whether an EIS is necessary. *E.g., Jones v. Gordon,* 792 F.2d 821, 829 (9th Cir.1986). Remand may not be a practical alternative, however, in a *Benn*-type action challenging agency policies and practices rather than a specific agency decision. In any event, remand is not appropriate where the agency could have no reasonable basis for failing to prepare an EIS; in such a case,

remand merely wastes agency resources and delays the inevitable. *Fritiofson, supra,* 772 F.2d at 1238; *see also Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir.1985) *Thomas, supra,* 753 F.2d at 759–61; *Benn, supra,* 491 F.Supp. at 1252. In the instant case, the record makes it plain that an EIS on cumulative impacts will have to be prepared. Even if remand did not simply lead to further BLM foot-dragging, work on the EIS would not begin until BLM formally concluded that the EIS was necessary. Other parties would be prejudiced by the resulting delay. The court will therefore require BLM to prepare the needed EIS.

■ The final question to be answered is whether an injunction should issue pending completion of the EIS. In this connection, the court must perform a "balancing of equities and hardships." *TVA v. Hill,* 437 U.S. 153, 193–94, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978); *see also Amoco Production Co. v. Village of Gambell,* — U.S. ——, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 1396 (1987). As the Supreme Court has noted, however,

> [e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Village of Gambell,* 107 S.Ct. at 1404.

Here substantial harm to the environment would be a practical certainty should no injunction issue. On the other side of the ledger, however, is the impact that an injunction would have on miners. The loss of even one season would apparently force some miners into bankruptcy. AMA Exh.

---

9. With respect to claims relating to operations under Notices, the rationale for dismissal was somewhat different. Memorandum and Order filed November 21, 1986, at 17.

10. This practice continued through the 1986 season. *E.g.,* Environmental Assessment on 3809 Plan of Operations—Ray Lester (F–48836) (1986).

11. BLM did not raise the issue of exhaustion in its moving papers, despite the court's invitation

that it do so. November 21 order at 18–19. That issue was raised only after plaintiffs had responded to the motion. Were it timely raised, the court would probably exercise its discretion to waive exhaustion, which is not a jurisdictional doctrine in this context. *See generally Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation,* 792 F.2d 782, 790–91 (9th Cir. 1986).

17. It must be remembered that the miners are innocent parties in this dispute. The court has not made, and on the present record could not make, any finding that the miners are operating illegally. Instead, it is BLM that has violated the law by failing to comply with NEPA before approving mining operations. Finally, while the public interest would suffer in the event of further degradation of the Birch Creek Wild River segment, the public interest would likewise be harmed should the court deliver a crippling blow to the economy of the Circle Mining District.

The 1987 mining season is beginning; by now, miners will have made irretrievable financial commitments to operating this summer. The court finds that the equities favor allowing the 1987 season to go forward. An injunction will be entered effective October 1, 1987, enjoining BLM from approving any placer mining Plan of Operations in the watershed of Birch Creek National Wild River until an EIS assessing cumulative impacts has been prepared. Prior approvals will be declared void as of that date. The injunction will contain a provision allowing any miner to move the court for individual relief from the injunction if he is able to show that his mine does not contribute to cumulative environmental impacts in the Wild River corridor. *See Northern Alaska Environmental Center v. Hodel*, No. J85–9 Civil (D.Alaska December 4, 1985), slip op. at 7 & n. 4; *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 471 (9th Cir.1986).

Delaying entry of the injunction until the close of this season will give miners a year to prepare for its impact. Some may be able to scale down their operations to operate under Notices.[12] Of course, it is also remotely possible that BLM will complete its EIS in time for the 1988 season.

The injunction will be entered by separate document.

Accordingly, IT IS ORDERED:

(1) THAT plaintiffs' motion for partial summary judgment (Docket No. 36) is granted in part as set forth above;

(2) THAT federal defendants' motion for partial summary judgment (Docket No. 144) is denied in part as set forth above.

## SECOND MEMORANDUM AND ORDER ON CUMULATIVE IMPACT CLAIMS

THIS CAUSE comes before the court on the aspects of plaintiffs' motion for partial summary judgment not previously addressed or mooted, on plaintiffs' renewed motion for partial summary judgment regarding Paragraph 60 of the Amended Complaint, and on federal defendants' motion for partial summary judgment. In the discussion that follows, the court will refer to federal defendants collectively as "BLM," and to the Alaska Miners Association and the Miners Advocacy Council collectively as "AMA." This memorandum and order should be read in conjunction with the court's May 14, 1987 "Memorandum and Order on Cumulative Impact Claims," cited hereafter as "May 14 order."

### I. SUMMARY

This ruling extends the injunction previously ordered for the Birch Creek watershed to the watersheds of two other components of the National Wild and Scenic Rivers System—Beaver Creek and the Fortymile River—and to certain rivers draining into Minto Flats, northwest of Fairbanks. As in the case of the Birch Creek drainage, the injunction applies only to BLM's approval of mining operations disturbing more than five acres of federal land, and the injunction will not take effect until the end of the 1987 season. It will remain in

---

**12.** Although the scope of the EIS must encompass operations under Notices, *see supra* p. 1303, operations under Notices will not be affected by the injunction. *See* 43 C.F.R. § 3809.1–3(b). Plaintiffs claim that BLM in fact approves operations under Notices, and that these "approvals" are federal actions. In a prior order, the court has denied summary judgment to plaintiffs on this issue. The denial of summary judgment regarding Notices is now on appeal.

Should plaintiffs eventually establish that BLM's procedure for handling Notices is an approval process triggering NEPA, the court will modify the injunction to encompass mines under Notices.

effect until BLM evaluates the cumulative environmental effects of placer mining in the Birch Creek, Beaver Creek, and Fortymile drainages, and the cumulative impacts of mining on subsistence activities in the Birch Creek and Minto Flats watersheds. The precise nature of the required evaluations varies from watershed to watershed, as explained more fully below. The injunction will be entered separately as to each watershed, so that as soon as BLM complies with the court's orders with respect to a particular drainage, that drainage will be released from the injunction.

There is evidence that certain mines along Mosquito Fork, a tributary of the Fortymile, do not contribute appreciably to cumulative impacts in the Fortymile drainage. These mines have been excepted from the injunction.

## II. BIRCH CREEK—
## SUBSISTENCE IMPACT

Birch Creek Village is located roughly 75 miles downstream of the Wild River segment of Birch Creek. The U.S. Fish and Wildlife Service has determined that "[m]ineral development along the Birch Creek National Wild River drainage system severely degrades the subsistence fishery for the residents of Birch Creek Village...." Steese N.C.A. Resource Mgmt. Plan FEIS (Steese EIS) at 233 (comment). This evidence is uncontroverted. In addition, BLM's own River Management Plan for the Birch Creek National Wild River (at 18–19) observes that turbidity originating in the Wild River drainage interferes with use of river water for drinking by village residents. *See also* Steese EIS at 127–28. Finally, it is uncontroverted that Birch Creek residents have traditionally drawn heavily on the river for fish and drinking water. Declaration of Susan James. Plaintiffs argue that these cumulative impacts of placer mining trigger the notice and hearing requirements of ANILCA § 810(a), 16 U.S.C. § 3120(a), and that BLM may not approve mining operations in the Wild River watershed until it complies with the § 810(a) procedure.

The court agrees with plaintiffs. The threshold for triggering ANILCA's notice and hearing requirement is quite low: it is triggered whenever "the contemplated action *may* significantly restrict subsistence uses." *Tribal Village of Akutan v. Hodel,* 792 F.2d 1376, 1379 (9th Cir.1986) (emphasis in original), *vacated on other grounds,* —— U.S. ——, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987); *People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1421–22 (9th Cir.1985), *rev'd on other grounds,* —— U.S. ——, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Kunaknana v. Clark,* 742 F.2d 1145, 1151 (9th Cir.1984). The cumulative impacts of placer mining exceed this threshold.

BLM contends that § 810 does not require any consideration of cumulative impacts. But the Supreme Court has held that § 102(2)(C) of NEPA—which likewise makes no explicit mention of cumulative impacts—requires such consideration in certain circumstances. *Kleppe v. Sierra Club,* 427 U.S. 390, 409–10, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). NEPA case law is helpful in interpreting § 810. *See Tribal Village of Akutan v. Hodel,* No. A85–701 Civil (D.Alaska Jan. 13, 1986), slip op. at 3 n. 1, *aff'd,* 792 F.2d 1376 (9th Cir.1986), *vacated on other grounds,* —— U.S. ——, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987). Defendants have suggested no reason to disregard the common-sense principles of *Kleppe* in this instance. The court holds that the cumulative impact outlined above requires unified analysis. *See* May 14 order at 1303–04.

BLM suggests that the injury to subsistence is not traceable to mining operations approved by BLM. In its May 14 ruling, the court demonstrated that deterioration in Birch Creek water quality was, in part, attributable to such operations. BLM's ripeness concerns are likewise addressed in that order.

Finally, BLM suggests that the appropriate remedy for a § 810 violation is remand to the agency for consideration of whether significant restriction of subsistence uses is possible. While this would ordinarily be the case, for reasons paralleling those set

forth at page 1305 of the May 14 ruling the court finds that remand would be inappropriate here. The court will therefore require BLM to comply with the procedures set forth in ANILCA § 810(a)(1)–(3), and to incorporate its findings in the EIS previously ordered for Birch Creek. *See* ANILCA § 810(b), 16 U.S.C. § 3120(b). For reasons explained at pages 1305–1306 of the May 14 order, an injunction will be entered on the basis of the § 810 claim, effective October 1, 1987.

### III. BEAVER CREEK

Beaver Creek is a National Wild River draining the region between the Steese and Elliott Highways, forty miles north of Fairbanks. The 127–mile Wild River segment falls almost entirely within the White Mountains National Recreation Area. The level of importance that Congress has attached to designated Wild Rivers was discussed in the May 14 order. BLM has stated that "Beaver Creek has national significance as a recreational resource." White Mountains N.R.A. Proposed Resource Management Plan FEIS (1984) ("White Mountains EIS"), at 249.

With respect to Beaver Creek, the factual record is not as well developed as it is with respect to Birch Creek. In recent years, five placer mines have operated in the upper Beaver Creek watershed, four of them under Plans of Operations. Three of the mines under Plans of Operations are located in a six-mile stretch of Nome Creek. Barnett Declaration Exh. B. This group of mines "periodically" has caused "highly turbid" conditions over a 50–mile segment of the Wild River, with a resulting periodic "decline" in fishing opportunities. White Mountains EIS at 117, 135. All of this evidence is uncontroverted, but the frequency and duration of adverse effects are not clear.

Plaintiffs seek an order requiring an EIS on cumulative impacts of placer mining in the watershed. For reasons set forth in the May 14 order, the court rejects defendants' ripeness challenge and will consider plaintiffs' claim on its merits.

The placer mines in the Beaver Creek watershed plainly have cumulative and synergistic impacts; the issue is whether the impacts are significant. If there are at least substantial questions as to their significance, BLM must prepare an EIS. *See* May 14 order at 1303–1304. BLM apparently has never considered the issue of cumulative impacts in preparing Environmental Assessments (EA's) on Beaver Creek watershed mines. To the extent that it has considered the issue in passing in the White Mountains EIS, it has not adequately explained the nature of the cumulative impacts nor why an EIS assessing them would not be necessary.[1] In contrast to the Birch Creek watershed, however, the limited factual record available here does not enable the court to determine that BLM could not reasonably decide under any circumstances that an EIS is unnecessary. The court will therefore permit BLM to examine the question of cumulative impacts and decide whether to prepare an EIS. *See Jones v. Gordon,* 792 F.2d 821, 829 (9th Cir.1986). The court will retain jurisdiction to evaluate whether BLM has "provide[d] a reasoned explanation of whatever course it elects to pursue." *Id.* In the meantime, an injunction will be entered, *see id.; Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1394 (9th Cir.1985), according to the same terms as the Birch Creek drainage.

Because the court is reviewing a BLM policy and practice of failing to evaluate cumulative impacts, rather than a particular EA, there is no 1987 EA before the court to be remanded for further work. The court suggests that BLM prepare a separate EA on cumulative impacts. Alternatively, the Bureau may include an evaluation of the need for a cumulative EIS in an EA for a Plan of Operations within the drainage, but the court does not favor this alternative because it could result in simultaneous review of the EA by two tribu-

1. Of course, the White Mountains EIS is not itself an EIS on cumulative placer mining impacts. The discussion of these impacts and the consideration of alternatives is far too general- ized; moreover, there is no consideration of a no-action alternative with respect to mine approvals (*i.e.,* no approvals). *See* 40 C.F.R. § 1502.14(d).

nals—this court and the IBLA—should approval of the particular Plan be challenged administratively. *Cf.* Memorandum and Order filed November 21, 1986, at 5–17.

## IV. FORTYMILE RIVER

Plaintiffs also seek a cumulative EIS for the Fortymile watershed. BLM's policy and practice has been to evaluate mining in the watershed on a piecemeal basis, ignoring cumulative impacts.

■ The Fortymile watershed contains a sprawling network of clearwater streams classified under the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.* Segments and tributaries are variously denoted "Wild," "Scenic," or "Recreational." All three classifications reflect a Congressional finding that the stretch of river in question is "remarkable" and merits substantial protection. *Id.* There has been placer mining in portions of the watershed for many decades; indeed, the historical interest of the rivers as early mining centers is surely part of the reason for their inclusion in the National Wild and Scenic Rivers System. Nonetheless, there has been an increase in placer mining since the Wild and Scenic designation was conferred, resulting in a substantial decline in water quality in some of the protected rivers. In 1985, nine mines under Plans of Operations functioned somewhere among the various Wild, Scenic, and Recreational river corridors. Pl.P.I.Exh. 2. Significantly, these mines were located within the corridors, in contrast to the circumstances in the Birch and Beaver Creek watersheds.[2] *Id.* Also operating that year were at least twelve suction dredges that were subject to BLM jurisdiction by virtue of associated long-term camping permits. Pl.P.I.Exh. 26. In addition, a number of operations under Notices and suction dredge operations not under BLM jurisdiction could be found somewhere in the watershed.

State Department of Environmental Conservation studies show greatly elevated turbidity levels in Wade Creek, a "Recreational" segment.[3] Fortymile Mining District Annual Reports (1984 & 1985). Turbidity from four Wade Creek operations dramatically affects water quality in the "Scenic" Walker Fork and South Fork segments. *Id.;* River Management Plan, Fortymile N.W.S.R. (1983), at 13–14. In the Walker Fork watershed and within the South Fork and Main Stem segments other operations add to sediment load and cumulative visual impact. *Id.* On the other hand, the evidence suggests that four operations on the Mosquito Fork segment upstream of the Taylor Highway may not contribute appreciably to cumulative impacts on water quality in the remainder of the drainage. ADEC Annual Reports at 4 (1984) and 5 (1985).

At least four operations under Plans of Operations take place in the heavily affected Wade-Walker-South Fork-Main Stem group of corridor segments. *See* EA's on 3809 Plans of Mining Operations (1986) for Vernon Weaver, Smith Bench Mining, Garland Achman, and James Leach. Hence the record shows that mines subject to BLM approval and federal action contribute to the degradation of this core area of the Fortymile drainage. The record further demonstrates that the cumulative impact of these approvals, coupled with other mining operations in the area, may be significant; BLM must therefore prepare an EIS. May 14 order at 1303.

In deciding upon a remedy for BLM's NEPA violation, the court finds that the balance of equities is the same as for the Birch Creek watershed, with the following exception. Because mining on Mosquito Fork above the Taylor Highway apparently does not contribute significantly to downstream environmental degradation, the balance of equities does not favor enjoining Mosquito Fork operations at this time. Placer operations in the Mosquito drainage

---

2. Accordingly, any analysis of cumulative impacts in the corridors should encompass the physical and visual impacts of the mines. *Cf.* May 14 order at 1303 n. 4.

3. Plaintiffs also complain of alterations to the stream course of Wade Creek, but some or all of these alterations may result from mining in the 1930's and 1940's. River Management Plan, Fortymile N.W.S.R. (1983), at 18.

unquestionably could have significant downstream impacts; should evidence of such impacts develop in the future, the court may extend the injunction to encompass such operations.

The injunction will apply to approvals of Plans pursuant to 43 C.F.R. § 3809.1–6 and approvals of long-term camping permits associated with mining.[4] It will be entered according to the same terms as the injunctions for the Birch and Beaver Creek watersheds.

## V. MINTO FLATS RIVERS [5]

The Tolovana and Chatanika Rivers and Goldstream Creek converge near the Native Village of Minto in Minto Flats. Uncontroverted evidence shows that village residents use the three rivers and the Tolovana below the confluence for subsistence activities. According to the village Chief, water in these rivers has become muddier in recent years, and river-based subsistence activities have suffered. The Chief links the decline in water quality to upstream placer mining.

In 1985, the combined watershed contained 28 placer mines, 17 of them on BLM land. It is not clear how many of these operations surpassed the five-acre threshold and required BLM approval. In 1986 at least three operations large enough to require approval were active in the combined watershed, two in the Chatanika headwaters 100 or more river miles upstream of confluence and one in the Goldstream headwaters 60 or more river miles upstream of

the confluence. EA's on 3809 Plans of Mining Operations (1986) for Richard L. McIntosh, The Mining Company/John E. McClain, and Cacy Patton. The 1986 EA's indicate that each of these mines added to turbidity in downstream waters. *Id.; see also* Declaration of Cacy Patton (AMA Exh. 17.42), at 2 ("5 NTU's [of added turbidity] is presently unattainable"). All of these facts are uncontroverted.

Plaintiffs argue that BLM should be required to perform the notice and hearing procedures set forth in ANILCA § 810(a)(1)–(3). *Cf supra* Part II. BLM, as a matter of policy and practice, has never evaluated cumulative impacts when approving placer operations in the Minto Flats watershed, and hence has never considered whether such impacts might trigger § 810's notice and hearing requirements.

 In the court's view, the first sentence of § 810(a) requires BLM to evaluate cumulative impacts in the circumstances presented here. Part II, *supra.* Because the factual record is not as well developed as it is for Birch Creek, however, the court declines to find as a matter of law that BLM could not reasonably determine that there is no likelihood of significant impact on subsistence uses.[6] The court will therefore require BLM to evaluate cumulative effects and to provide a reasoned explanation for any finding that subsistence is not significantly restricted by placer mining in the combined watershed.[7] Until such an

---

4. Plaintiffs' claim with respect to cumulative impacts of long-term camping permits remains live. *Cf.* Memorandum and Order filed January 29, 1987, at 3–4.

 The EA and EIS must, of course, consider the impacts of placer mines and suction dredging operations not subject to the injunction. May 14 order at 1303, 1306 n. 12.

5. The omission of Minto Flats from the listing of retained claims in the Summary of the court's November 21, 1986 order was an oversight.

6. Plaintiffs rely on a single, brief lay affidavit for the bulk of their argument. In contrast to Birch Creek and, to a lesser extent, the Fortymile, there is no detailed scientific data tracing the effect of particular operations or groups of operations on downstream water quality.

7. As in the case of the Beaver Creek NEPA evaluation, BLM has some discretion with respect to the packaging of this evaluation. Ordinarily, an evaluation of potential cumulative restriction should be part of the standard subsistence evaluation for each Plan approval in a watershed such as the combined watershed at issue here. BLM may prefer to prepare a separate document on cumulative restriction, to be incorporated by reference in individual Plan approvals. The latter approach would be more convenient for the court.

 The appropriate geographic scope or subject matter for any notice and hearing procedure pursuant to § 810(a)(1)–(3) depends on BLM's findings with respect to which mines, if any, actually may contribute to significant subsistence restriction in the Minto Flats area. BLM must provide a reasoned explanation for exclu-

evaluation has been completed, together with any proceedings under § 810(a)(1)–(3) connected with the evaluation, the court will enjoin Plan approvals pursuant to 43 C.F.R. § 3809.1–6. The injunction will be entered according to the same terms as the injunction for the Birch Creek drainage. The court will retain jurisdiction to review the evaluation required above.

Accordingly, IT IS ORDERED:

(1) THAT plaintiffs' motion for partial summary judgment (Docket No. 36) is granted in part as set forth above;

(2) THAT plaintiffs' renewed motion for partial summary judgment regarding Paragraph 60 of the Amended Complaint (Docket No. 138) is granted;

(3) THAT federal defendants' motion for partial summary judgment (Docket No. 144) is denied.

## MEMORANDUM AND ORDER ON MODIFICATION OF INJUNCTIONS

Both BLM and AMA seek modification of the four injunctions entered on May 28, 1987. The court agrees that certain changes are in order, and will enter amended injunctions concurrently with this order. Attached as appendices "A" through "D" of this memorandum and order are copies of the injunctions showing additions and deletions.

### A. *Final Clause of Injunctions*

■ BLM objects to the final clause of each of the injunctions, which reads:

THAT federal defendants shall take all actions necessary to enforce and implement this injunction.

According to BLM, this clause is not sufficiently "specific in terms" to comply with F.R.Civ.P. 65(d).

In *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of America*, 633 F.2d 302, 310 (3d Cir.1980), the district court had

entered an injunction requiring the unions "to employ all means at their disposal to insure that this injunction is obeyed." The circuit court found this language too imprecise to satisfy Rule 65(d). *Id.* Following *Pittsburgh-Des Moines*, the court will delete the challenged clauses. The court will modify language in the body of the injunctions (item (5) in the Fortymile injunction; item (4) in all others) to ensure that BLM remains obligated to order the closure of any mine found, at any time while the injunctions are in force, to be operating without an approved Plan of Operations where such a Plan is required by the regulations.

### B. *Duration of Injunctions*

■ The injunctions are set to expire when BLM has prepared "adequate" environmental and subsistence studies. Hence, the injunctions will not expire until BLM has complied with NEPA, ANILCA, and applicable regulations. BLM would like the court to delete the word "adequate," simply requiring that studies be prepared. The Bureau claims it would otherwise be required to guess whether any studies it had prepared had dissolved the injunction.

Because the large number of innocent parties involved requires that disputes be resolved as quickly as possible, and because BLM's record of compliance with NEPA and ANILCA is poor, this court has retained jurisdiction to review the adequacy of the studies.[1] *Cf. Environmental Defense Fund, Inc. v. Armstrong*, 487 F.2d 814, 816–17 (9th Cir.1973) (jurisdiction retained to review future EIS), *cert. denied*, 416 U.S. 974, 94 S.Ct. 2002, 40 L.Ed.2d 564 (1974); *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir.1972) (same). Any uncertainty regarding the adequacy of the studies can therefore be resolved quickly by application to the court. Moreover, it is standard in NEPA cases for courts to provide that a

sion of any proposed placer mining Plan of Operations within the combined watershed from any full-dress subsistence review pursuant to § 810(a)(1)–(3). Upon publication of such an explanation, BLM (or an individual miner acting pursuant to Paragraph (7) of the Minto Flats

injunction) may move for appropriate modification of the injunction.

1. At the suggestion of BLM, a term has been added to the injunctions expressly retaining such jurisdiction.

permanent injunction will remain in effect not only until an environmental study has been prepared but until an *adequate* study has been prepared. *E.g., Minnesota PIRG v. Butz*, 401 F.Supp. 1276, 1333 (D.Minn. 1975), *rev'd in part on other grounds*, 541 F.2d 1292 (8th Cir.1976), *cert. denied*, 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). Reviewing an injunction issued by this court that contained just such a provision, the Ninth Circuit has held that "it was entirely proper for the court to enjoin further mining until *proper* environmental analyses are conducted." *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466, 471 (9th Cir.1986) (emphasis add·ed). The court will not delete the challenged language.

### C. *Effective Date of Injunctions*

AMA argues that the injunctions should not prohibit most mining operations at all, because loss of the 1988 or 1989 seasons could bankrupt many miners.[2] The court was aware of the potential for severe hardship to miners when it originally balanced the equities in this case. By permitting the 1987 season to go forward despite a complete absence of the NEPA or ANILCA § 810 prerequisites, the court believes it exercised its maximum discretion in favor of the miners.

AMA correctly observes that the court intended to allow completion of work under 1987 Plans of Operations. The Association has provided new evidence showing that an October 1 closing date would cut short some of these operations. The court will therefore change the effective date of the injunctions to November 15, ensuring that operations approved for this year can be completed in an orderly manner.

### D. *Mines Having No Impact on Water Quality*

■ Observing that the court's primary concern in entering these injunctions was water quality, BLM has suggested new language that would exempt "zero-discharge" mines, such as mines using a recycle system. It is not clear whether any

such mines exist in the area covered by the injunctions, or, if so, what their precise locations and physical characteristics are. BLM's proposal ignores the fact that even a "zero-discharge" placer mine can affect the environment of a downstream Wild and Scenic River corridor by, for example, destroying tributary fish habitat. As the record now stands, there is no basis for narrowing the scope of the injunctions.

### E. *Exhaustion of Remedies*

BLM has renewed an exhaustion of remedies argument that has been rejected by the court both on procedural grounds and on its merits. May 14, 1987 memorandum and order at n. 11; June 23, 1987 memorandum and order at 7. The court declines to reconsider this issue.

Accordingly, IT IS ORDERED:

(1) THAT federal defendants' Motion for Reconsideration and Amendment of Injunctions (Docket No. 199) is granted in part and denied in part as set forth above;

(2) THAT Alaska Miners Association's Motion for Reconsideration (Docket No. 201) is granted;

(3) THAT upon reconsideration the court modifies the injunctions entered in this action as set forth in Appendices A through D of this memorandum and order.

### APPENDIX A

### INJUNCTION FOR BIRCH CREEK WATERSHED

Pursuant to this court's [Memorandum] memoranda and [Order on Cumulative Impact Claims] orders filed May 14, May 28, and July 21, 1987, [and this court's Memorandum and Order filed May 28, 1987,] IT IS ORDERED:

(1) THAT this injunction shall apply to all lands and waters draining into that part of Birch Creek designated a component of the National Wild and Scenic Rivers System pursuant to 16 U.S.C. § 1274(a)(46),

---

**2.** BLM states that it does not expect to complete any of the required studies until December of 1988. With respect to the Minto Flats drainage, this estimated schedule strikes the court as astonishingly slow.

which lands and waters shall be referred to herein as "the Birch Creek watershed";

(2) THAT effective [October 1] November 15, 1987, federal defendants are enjoined from approving, pursuant to 43 C.F.R. § 3809.1–6(a) or otherwise, any Plan of Operations for any placer mine within the Birch Creek watershed;

(3) THAT effective [October 1] November 15, 1987, any prior approval of any Plan of Operations for any placer mine within the Birch Creek watershed shall be void;

(4) THAT the Bureau of Land Management shall order [existing] any placer mining [operations under Plans of Operations within the Birch Creek watershed] operation within the Birch Creek Watershed requiring a Plan of Operations under 43 C.F.R. § 3809.1–4 to shut down prior to [October 1] November 15, 1987, such closure to continue until this injunction has expired;

(5) THAT, notwithstanding item (4) or any other provision of this injunction, the Bureau of Land Management may, in its discretion, allow reclamation work to continue or commence after [October 1] November 15, 1987;

(6) THAT this injunction shall remain in effect until

(a) an adequate Environmental Impact Statement has been prepared studying any cumulative or synergistic environmental effects of placer mining within the Birch Creek Watershed upon the Birch Creek component of the National Wild and Scenic Rivers System, AND

(b) the Bureau of Land Management has adequately performed the procedures set forth in 16 U.S.C. § 3120(a)(1) through (3) and 16 U.S.C. § 3120(b) with respect to any cumulative or synergistic restriction of subsistence uses, needs, or resources caused by placer mining within the Birch Creek Watershed;

(7) THAT this court shall retain jurisdiction to review the adequacy of the Environmental Impact Statement and subsistence review referred to in item (6);

[ (7) ] (8) THAT any miner, upon colorable showing that his operation does not contribute to the cumulative or synergistic environmental effects or restriction of subsistence uses, needs, or resources referred to in item (6), may move to be granted limited intervenor status for the sole purpose of moving for individual relief from this injunction;

[ (8) ] (9) THAT no later than [June 26] August 7, 1987, the Bureau of Land Management shall inform all persons of this injunction who have submitted 1987 Plans of Operations for placer mines within the Birch Creek watershed[;].

[ (9) THAT federal defendants shall take all actions necessary to enforce and implement this injunction.]

## APPENDIX B

### INJUNCTION FOR BEAVER CREEK WATERSHED

Pursuant to [Part III of] this court's [memorandum] memoranda and [order] orders filed May 28 and July 21, 1987, IT IS ORDERED:

(1) THAT this injunction shall apply to all lands and waters draining into that part of Beaver Creek designated a component of the National Wild and Scenic Rivers System pursuant to 16 U.S.C. § 1274(a)(45), which lands and waters shall be referred to herein as "the Beaver Creek watershed";

(2) THAT effective [October 1] November 15, 1987, federal defendants are enjoined from approving, pursuant to 43 C.F.R. § 3809.1–6(a) or otherwise, any Plan of Operations for any placer mine within the Beaver Creek watershed;

(3) THAT effective [October 1] November 15, 1987, any prior approval of any Plan of Operations for any placer mine within the Beaver Creek watershed shall be void;

(4) THAT the Bureau of Land Management shall order [existing] any placer mining [operations under Plans of Operations within the Beaver Creek watershed] operation within the Beaver Creek watershed requiring a Plan of Operations under 43 C.F.R. § 3809.1–4 to shut down prior to

 [October 1] November 15, 1987, such closure to continue until this injunction has expired;

(5) THAT, notwithstanding item (4) or any other provision of this injunction, the Bureau of Land Management may, in its discretion, allow reclamation work to continue or commence after [October 1] November 15, 1987;

(6) THAT this injunction shall remain in effect until

(a) the Bureau of Land Management has adequately considered whether it must prepare an Environmental Impact Statement (EIS) on cumulative or synergistic environmental effects of placer mining within the Beaver Creek watershed upon the Beaver Creek component of the National Wild and Scenic Rivers System, and has decided that no EIS is necessary, and has provided a reasoned explanation for its decision, OR

(b) the Bureau of Land Management has prepared an adequate EIS studying any cumulative or synergistic environmental effects of placer mining within the Beaver Creek watershed upon the Beaver Creek component of the National Wild and Scenic Rivers System;

(7) THAT this court shall retain jurisdiction to review the adequacy of any EIS or reasoned explanation prepared pursuant to item (6);

[(7)] (8) THAT any miner, upon colorable showing that his operation does not contribute to the cumulative or synergistic environmental effects referred to in item (6), may move to be granted limited intervenor status for the sole purpose of moving for individual relief from this injunction;

[(8)] (9) THAT no later than [June 26] August 7, 1987, the Bureau of Land Management shall inform all persons of this injunction who have submitted 1987 Plans of Operations for placer mines within the Beaver Creek watershed[;].

[(9) THAT federal defendants shall take all actions necessary to enforce and implement this injunction.]

## APPENDIX C

## INJUNCTION FOR FORTYMILE WATERSHED

Pursuant to [Part IV of] this court's [memorandum] memoranda and [order] orders filed May 28 and July 21, 1987, IT IS ORDERED:

(1) THAT this injunction shall apply to all lands and waters draining into those parts of the Fortymile River and its tributaries designated components of the National Wild and Scenic Rivers System pursuant to 16 U.S.C. § 1274(a)(48), with the exclusion of those lands and waters draining into the Mosquito Fork segment of the Fortymile National Wild and Scenic River upstream of the Taylor Highway bridge;

(2) THAT the lands and waters described in item (1) shall hereinafter be referred to as "the Fortymile watershed";

(3) THAT effective [October 1] November 15, 1987, federal defendants are enjoined from approving, pursuant to 43 C.F.R. 3809.1–6(a) or otherwise, any Plan of Operations for any placer mine within the Fortymile watershed;

(4) THAT effective [October 1] November 15, 1987, any prior approval of any Plan of Operations for any placer mine within the Fortymile watershed shall be void;

(5) THAT the Bureau of Land Management shall order [existing] any placer mining [operations under Plans of Operations within the Fortymile watershed] operation within the Fortymile watershed requiring a Plan of Operations under 43 C.F.R. 3809.-1–4 to shut down prior to [October 1] November 15, 1987, such closure to continue until this injunction has expired;

(6) THAT, notwithstanding, item (5) or any other provision of this injunction, the Bureau of Land Management may, in its discretion, allow reclamation work to continue or commence after [October 1] November 15, 1987;

(7) THAT effective [October 1] November 15, 1987, federal defendants are enjoined from approving long-term camping

permits associated with placer mining within the Fortymile watershed;

(8) THAT effective [October 1] November 15, 1987, any previously issued long-term camping permit associated with placer mining within the Fortymile watershed shall be void;

(9) THAT the Bureau of Land Management shall order [existing] any long-term [camps] camp associated with placer mining within the Fortymile watershed to shut down prior to [October 1] November 15, 1987, such closure to continue until this injunction has expired;

(10) THAT this injunction shall remain in effect until an adequate Environmental Impact Statement has been prepared studying any cumulative or synergistic environmental effects of placer mining within the Fortymile watershed or within the Mosquito Fork drainage upon those parts of the Fortymile River and its tributaries designated components of the National Wild and Scenic Rivers System pursuant to 16 U.S.C. § 1274(a)(48);

(11) THAT this court shall retain jurisdiction to review the adequacy of the Environmental Impact Statement referred to in item (10);

[ (11) ] (12) THAT any miner, upon colorable showing that his operation does not contribute to the cumulative or synergistic environmental effects referred to in item (10), may move to be granted limited intervenor status for the sole purpose of moving for individual relief from this injunction;

[ (12) ] (13) THAT no later than [June 26] August 7, 1987, the Bureau of Land Management shall inform all persons of this injunction who have submitted 1987 Plans of Operations for placer mines within the Fortymile watershed, or who have applied for long-term camping permits for 1987 for camping associated with placer mining within the Fortymile watershed[;].

[ (13) THAT federal defendants shall take all actions necessary to enforce and implement this injunction.]

## INJUNCTION FOR MINTO FLATS WATERSHED

Pursuant to [Part V of] this court's [Memorandum] memoranda and [Order] orders filed May 28 and July 21, 1987, IT IS ORDERED:

(1) THAT this injunction shall apply to all lands and waters draining into the Tolovana River, the Chatanika River, or Goldstream Creek, which lands and waters shall hereafter be referred to as "the Minto Flats watershed";

(2) THAT effective [October 1] November 15, 1987, federal defendants are enjoined from approving, pursuant to 43 C.F.R. § 3809.1-6(a) or otherwise, any Plan of Operations for any placer mine within the Minto Flats watershed;

(3) THAT effective [October 1] November 15, 1987, any prior approval of any Plan of Operations for any placer mine within the Minto Flats watershed shall be void;

(4) THAT the Bureau of Land Management shall order [existing] any placer mining [operations under Plans of Operations within the Minto Flats watershed] operation within the Minto Flats watershed requiring a Plan of Operations under 43 C.F.R. § 3809.1-4 to shut down prior to [October 1] November 15, 1987, such closure to continue until this injunction has expired;

(5) THAT, notwithstanding item (4) or any other provision of this injunction, the Bureau of Land Management may, in its discretion, allow reclamation work to continue or commence after [October 1] November 15, 1987;

(6) THAT this injunction shall remain in effect until

(a) the Bureau of Land Management has (i) adequately evaluated, pursuant to 16 U.S.C. § 3120, any cumulative or synergistic effect of placer mining within the Minto Flats watershed upon subsistence uses and needs, has (ii) concluded that such effect will not significantly restrict subsistence

uses, and has (iii) provided a reasoned explanation for its conclusion, OR

(b) the Bureau of Land Management has adequately performed the procedures set forth in 16 U.S.C. § 3120(a)(1) through (3) with respect to any cumulative or synergistic restriction of subsistence uses, needs, or resources caused by placer mining within the Minto Flats watershed;

(7) THAT this court shall retain jurisdiction to review the adequacy of any procedures performed pursuant to item (6);

[ (7) ] (8) THAT any miner, upon colorable showing that his operation does not contribute to the cumulative or synergistic restriction of or effect upon subsistence uses, needs, or resources referred to in item (6), may move to be granted limited intervenor status for the sole purpose of moving for individual relief from this injunction;

[ (8) ] (9) THAT no later than [June 26] August 7, 1987, the Bureau of Land Management shall inform all persons of this injunction who have submitted 1987 Plans of Operations for placer mines within the Minto Flats watershed[;].

[ (9) THAT federal defendants shall take all actions necessary to enforce and implement this injunction.]