Sam HANLON, Sr., Individually and as Chief of the Wooshikitaan Clan, Richard Sheakley, Sr., Individually and as Chief of the T'Addeintaan Clan, Victor Bean, Richard Bean, Jr., Ernestine Hanlon, George Westman, and Douglas Glessing, Plaintiffs,

v.

Michael BARTON, in his official capacity as Regional Forester for the Alaska Region, Dale Robertson, in his official capacity as Chief of the United States Forest Service, Clayton Yeutter, in his official capacity as Secretary of Agriculture, and the United States Forest Service, an agency within the Department of Agriculture, Defendants,

Alaska Pulp Corporation, Intervenor–Defendant.

No. J88–025 Civil.

United States District Court, D. Alaska.

Nov. 14, 1988.

Alaska Legal Services, Vance A. Sanders, Mark Regan, Juneau, Alaska, Carol A. Daniel, Joseph D. Johnson, Anchorage, Alaska, for plaintiffs.

Bruce M. Landon, Land & Natural Resources Div., Dept. of Justice, Anchorage, Alaska, for defendants.

James F. Clark, Mary A. Nordale, Robertson, Monagle & Eastaugh, Juneau, Alaska, for intervenor-defendant.

## MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

THIS CAUSE comes before the court on plaintiffs' motion for preliminary injunction, filed July 21, 1988 (Docket No. 2). Plaintiffs are several subsistence resource users and residents of Hoonah, Alaska.

## I. INTRODUCTION.

In 1957, intervenor-defendant Alaska Pulp Corporation (APC) executed a contract with the federal government prescribing terms for timber sales and logging in southeastern Alaska over a fifty year period.[1] The contract provides for harvesting of 4,974,700,000 board feet of timber within the sale area between 1961 and 2011.

---

**1.** Contract No. 12–11–010–1545 (Contract), 1986–90 Operating Period for the APC Long–Term Sale Area, Final Environmental Impact Statement (FEIS) at Vol. III, App. A, Ex. 34,

Memorandum in support of motion for preliminary injunction, filed July 21, 1988 (Docket No. 2) (hereinafter "Motion").

Since 1971, logging, road building, and related activities have been specifically planned and authorized by the defendant Forest Service of the United States Department of Agriculture for successive five-year periods. Previous five-year plans have been subject to the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA), and it has been determined that five-year operating plans are major federal actions significantly affecting the human environment, thus requiring preparation of an environmental impact statement (EIS) under NEPA. *See Tenakee Springs v. Block,* 778 F.2d 1402, 1404, 1408 (9th Cir.1985) (*Tenakee I*). The 1986–90 five-year plan at issue here is the first plan to be subject to the provisions of the Alaska National Interest Lands Conservation Act, 16 U.S.C. 3101 et seq. (ANILCA), as well.

On December 31, 1986, the Forest Service, as the delegate of the Secretary of Agriculture, approved a proposed five-year operating plan for harvesting commencing January 1, 1987 and terminating December 31, 1990.[2] The Service approved the plan based on an evaluation and discussion of alternative proposals contained in the 1986–90 Operating Period for the Alaska Pulp Corporation Long–Term Sale Area, Final Environmental Impact Statement (FEIS).[3] Plaintiffs claim that the Forest Service's decision approving the plan violated section 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), because it was based upon a Finding of No Significant Restriction (FONSR) that does not comply with the requirements of ANILCA, and upon an FEIS that does not comply with the requirements of NEPA.

## II. PRELIMINARY INJUNCTION STANDARD.

In *United States v. Odessa Union Warehouse Co-op.,* the Ninth Circuit Court of Appeals described the standard for determining claims for preliminary injunctive relief:

The factors we traditionally consider in determining whether to grant a preliminary injunction in this circuit are (1) the likelihood of plaintiff's success on the merits; (2) the possibility of plaintiff's suffering irreparable injury if relief is not granted; (3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by the provision of preliminary relief. To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of succcess decreases.

833 F.2d 172, 174 (9th Cir.1987). Accordingly, this court must as an initial matter determine whether plaintiffs have shown sufficient likelihood of success on the merits of their claims and probability of irreparable injury in the absence of injunctive relief to qualify for such relief. Furthermore, if plaintiffs make the requisite showing, the court then must balance the harms to each party that would result from a grant or denial of injunctive relief to determine if such relief is appropriate. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987); *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988).

## III. LIKELIHOOD OF SUCCESS ON THE MERITS OF PLAINTIFFS' CLAIMS.

### A. *Findings of No Significant Restriction under ANILCA § 810(a).*

Through ANILCA § 810(a), Congress imposed bifurcated procedural obligations on federal agencies contemplating "whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands" in Alaska. 16 U.S.C. 3120(a).

---

**2.** Regional Forester's Record of Decision (ROD), Ex. 2, Docket No. 2.

**3.** Ex. 34, Docket No. 2.

Section 810(a) directs the agency to make a threshold determination whether contemplated actions "would significantly restrict subsistence uses." *Id.* This determination may be referred to as the "tier-I" evaluation. *See Tribal Village of Akutan v. Hodel,* 792 F.2d 1376, 1377 (9th Cir.1986), *vacated on other grounds sub nom. Amoco Production Company v. Tribal Village of Akutan,* 480 U.S. 943, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987). If the agency makes an affirmative tier-I determination, section 810(a)(1)–(3) requires the agency to give notice to the communities affected, hold public hearings, and make specified findings about the propriety of the proposed action and the measures that will be taken to mitigate adverse impacts on subsistence uses and resources. 16 U.S.C. 3120(a)(1)–(3). If the agency concludes its tier-I evaluation with a finding of no significant restriction (FONSR), however, the tier-II obligations do not apply.

In this case, the Forest Service, in the course of evaluating environmental impacts pursuant to NEPA, considered ten proposed alternatives and concluded that "none of the proposed alternatives would significantly restrict subsistence opportunities" for the plaintiffs, residents of Hoonah.[4] Consequently, the Service did not perform the tier-II procedures.[5]

Plaintiffs contend that the Service applied the wrong legal standard when it issued the FONSR, rendering that finding, and the subsequent agency decision approving APC's five-year operating plan, invalid under ANILCA § 810(a).[6] Plaintiffs argue that the Service has established specific guidelines which it follows when performing the tier-I evaluation. Under these guidelines, the Service first seeks to determine whether or not significant restriction is "likely."[7] If the Service determines that such restriction is not likely, the guidelines direct the agency to declare that the proposed use "would not" and "shall not" significantly restrict subsistence uses.[8] Finally, plaintiffs aver that the Service followed these erroneous guidelines in promulgating the FONSR at issue here.[9]

Plaintiffs contend that the correct legal standard under ANILCA § 810(a) requires compliance with tier-II procedures wherever there is a possibility of significant restriction or a threat thereof. Further, plaintiffs argue, the agency need not find that restriction is "likely"—a greater threshold of certainty—before these procedural requirements apply.[10]

Courts that have addressed this issue have concluded that, as a matter of law, the specific procedural requirements of section 810(a)(1)–(3) are triggered by a "threat of significant restriction," *Gambell II,* 774 F.2d at 1422, or by a finding that a proposed action "may significantly restrict subsistence uses." *Id.; Penfold,* 664 F.Supp. at 1307. Moreover, the Ninth Circuit Court of Appeals has expressly rejected the view "that section 810(a)(1)–(3) procedures requir[e] a *likelihood* of signifi-

---

4. FEIS at Vol. I, § 4, at 216, Ex. 34, Docket No. 2.

5. Opposition to the motion for preliminary injunction, filed August 4, 1988 (Docket No. 13) at 10 (hereinafter "Opposition").

6. Motion at 21, Docket No. 2; FEIS at Vol. I, § 4, at 226, Ex. 34, Docket No. 2; ROD at 25, Ex. 2, Docket No. 2.

7. Motion at 20, Docket No. 2; FEIS at Vol. III, § H, at 6, Ex. 34, Docket No. 2; Forest Service Subsistence Management and Use Handbook at 1.1 (Handbook), Ex. 20, Docket No. 2.

8. Motion at 20, Docket No. 2; Handbook at 1.2, Ex. 20, Docket No. 2.

9. Motion at 21, Docket No. 2.

10. Motion at 20, Docket No. 2 (citing *Tribal Village of Akutan v. Hodel,* A85–701, slip op. at 3 (D. Alaska Jan. 13, 1986), *aff'd,* 792 F.2d 1376 (9th Cir.1986), *vacated on other grounds sub nom. Amoco Production Co. v. Tribal Village of Akutan,* 480 U.S. 943, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987); *Tribal Village of Akutan v. Hodel,* 792 F.2d 1376, 1379 (9th Cir.1986), *vacated on other grounds sub nom. Amoco Production Company v. Tribal Village of Akutan,* 480 U.S. 943, 107 S.Ct. 1598, 94 L.Ed.2d 785 (1987); *People of Village of Gambell v. Hodel,* 774 F.2d 1414, 1421–22 (9th Cir.1985) (*Gambell II*), *rev'd on other grounds sub nom. Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *Kunaknana v. Clark,* 742 F.2d 1145, 1151 (9th Cir.1984); *Sierra Club v. Penfold,* 664 F.Supp. 1299, 1307 (D. Alaska 1987), *aff'd,* 857 F.2d 1307 (9th Cir.1988)).

cant subsistence restrictions." *Akutan,* 792 F.2d at 1379 (original emphasis). The tier-II requirements apply wherever there is a significant possibility of significant restriction; such restriction need not be likely.

The Forest Service denies that it used an incorrect legal standard in issuing the FONSR. The Service argues that the language criticized by plaintiffs was approved by the Ninth Circuit in *Kunaknana.*[11] This argument is without merit. In *Kunaknana,* the Court of Appeals held that the tier-II requirements apply "if the agency first concludes that the contemplated action *may* significantly restrict subsistence uses." *Kunaknana,* 742 F.2d at 1151 (emphasis added). Later, the court approved agency analysis which "allowed a finding of no significance only if here were 'no' reductions or only 'slight' reductions...." *Id.* This latter analysis, however, pertained to the actionable extent, not the likelihood of restriction.[12]

The Service argues, in the alternative, that it used an appropriate "would not" standard in the FEIS, and that this standard, rather than the one described in the Handbook, governed its issuance of the FONSR.[13] This argument begs the question. The guidelines listed in the Handbook are referred to in the FEIS as the "Forest Service 810 Evaluation and Finding Procedure," and that document declares that a FONSR "must logically follow from" an evaluation "whether or not there is *likely* to be a reduction in subsistence use."[14] The fact that the Service ultimately concluded the proposed actions "would not" significantly restrict subsistence misses the point. Plaintiffs are challenging the methodology the Service used to reach its conclusion, not the phraseology it used to express it.

The court agrees with plaintiffs arguments, and concludes that plaintiffs have shown a near certainty of success on the merits of their claim that the Service applied the wrong legal standard in issuing the FONSR. The Service's error is more than semantical. The Service's procedure directs that a FONSR issue whenever significant restriction is deemed "unlikely"— i.e. less than a 50% probability. Hence, decisionmakers and other concerned individuals are unable to ascertain whether the agency concluded that the probability of significant restriction is, for example, merely 1%, and therefore clearly insignificant, or 49%, and hence more than the mere "threat of significant restriction" sufficient to trigger the tier-II requirements.

### B. *Evidence of Significant Possibility of Significant Restriction.*

Plaintiffs further contend that the basic factual determinations contained in the record of the Service's decision to approve the five-year plan reveal a significant possibility that road building and clearcutting will result in significant restrictions on subsistence.[15] Specifically, plaintiffs allege that the Service improperly issued the FONSR after acknowledging that road building in the Hoonah area would result in increased competition for subsistence resources from nonsubsistence deer hunters, and that clearcutting in the Hoonah area would result in deer population reductions.

The administrative record shows that the Service determined that road building under the 1986 operating plan will result in increased hunting competition from nonsubsistence deer hunters. Pursuant to the FONSR, the Service approved substantial construction of new roads in the Hoonah

---

**11.** Opposition at 14 n. 8, Docket No. 13 (citing *Akutan,* 792 F.2d at 1377).

**12.** The court notes that in order to determine whether an action "would significantly restrict" subsistence uses or resources, an agency must evaluate not only whether there is a significant likelihood, or probability, of restriction, but also whether the extent, or magnitude, of such restriction will be significant.

**13.** Opposition at 14–15, 15 n. 9, Docket No. 13; FEIS at Vol. I, § 4, at 213–16, Ex. 34, Docket No. 2.

**14.** FEIS at Vol. III, § H, at 5–6 (emphasis added), Ex. 34, Docket No. 2.

**15.** Motion at 23, Docket No. 2.

area.[16] The Service found that this roading will cause a significant increase in accessibility of remote interior areas to hunters, boaters and campers.[17] The Service does not dispute plaintiffs' assertion that Sitka blacktail deer are a staple in their diet,[18] and the FEIS acknowledges that deer hunting is an essential element of subsistence culture for plaintiffs, Hoonah residents.[19] The Service recognized that roading would result in increased use of the area by non-subsistence deer hunters from outside Hoonah,[20] but concluded that "the numbers of harvestable deer will exceed the expected harvest by subsistence and total hunters in all portions of the 1986–90 study area with implementation of any of the proposed alternatives."[21]

The administrative record also shows that the Service determined that harvesting under the 1986 operating plan will result in some reductions in deer populations in the Hoonah area. Timber harvesting of old-growth forest in the Tongass National Forest is done by the clearcutting method.[22] The Service recognizes that Sitka black-tail deer depend upon old-growth forest for survival, and that "the effects of harvesting old-growth wildlife habitats can be adverse and long lasting."[23] The Service approved clearcutting in the Hoonah area that will affect from 8% to 21% of the old-growth winter deer habitat during the five-year operating period.[24] The Service acknowledges that in certain areas this clearcutting would result in reductions in deer population which might be "noticeable" and which might result in reduced "distribution and availability or abundance" of deer.[25] However, the Service determined that the worst case impact on any of the relevant areas would result in a maintained carrying capacity 1.3 times the expected combined subsistence and nonsubsistence demand for huntable deer.[26] The Service, maintaining that winter-range carrying capacity data is the best available predictor of impact on deer populations,[27] concluded that "more than enough habitat would be available to produce adequate numbers of harvestable deer to meet expected demand in 1990."[28]

Agency findings of no significant restriction under ANILCA § 810(a) are reviewed pursuant to section 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See Kunaknana*, 742 F.2d at 1151. In *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, the United States Supreme Court construed the standard of review prescribed by the APA for courts reviewing actions taken by agencies pursuant to the informal rulemaking procedures of section 553 of the Administrative Procedure Act, 5 U.S.C. § 553:

**16.** FEIS at Vol. I, § 3, at 16, Ex. 34, Docket No. 2.

**17.** FEIS at Vol. I, § 4, at 51, Ex. 34, Docket No. 2.

**18.** Motion at 29, Docket No. 2 (citing plaintiffs' affidavits, Exs. 7–19, Docket No. 2).

**19.** FEIS at Vol. I, § 3, at 59–60, Ex. 34, Docket No. 2.

**20.** FEIS at Vol. I, § 4, at 214, 268, Ex. 34, Docket No. 2.

**21.** Opposition at 21, Docket No. 13; 1986 Wildlife Resource Report Amendment at 12, Ex. 8, Docket No. 13.

**22.** Intervenor's opposition to motion for preliminary injunction, filed Aug. 4, 1988 (Docket No. 15) at 12 (hereinafter "Intervenor").

**23.** FEIS at Vol. III, § 4, at 12–13, Ex. 34, Docket No. 2.

**24.** FEIS at Vol. I, § 4, at 17–18, Ex. 34, Docket No. 2; ROD at 19–20, Ex. 2, Docket No. 2.

**25.** FEIS at Vol. I, § 4, at 13, 174, Ex. 34, Docket No. 2.

**26.** Opposition at 20, Docket No. 13; FEIS at Vol. I, § 3, at 24 (map 3–2), 215, Ex. 34, Docket No. 2.

**27.** Opposition at 33–34, Docket No. 13; FEIS at Vol. I, § 4, at 12–27, 173–74, 178, Ex. 34, Docket No. 2.

**28.** Opposition at 18–19, Docket No. 13; FEIS at Vol. I, § 4, at 214, Ex. 34, Docket No. 2.

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted).

The court is limited with respect to the materials it may consider when reviewing actions taken by agencies pursuant to the informal rulemaking procedures of section 553 of the Administrative Procedure Act, 5 U.S.C. § 553:

[T]rial court review of agency decision-making is generally limited to the existing administrative record. This record may be supplemented with testimony from the officials who participated in the decision explaining their action or by formal findings prepared by the agency explaining its decision.

*Kunaknana,* 742 F.2d at 1152 (citations omitted). The court noted that this supplemental information "should be explanatory in nature, rather than a new rationalization of the agency's decision, and must be sustained by the record." *Id.* at 1149 (citation omitted). Generally, extrarecord evidence may not be admitted to challenge the scientific validity of an agency's decision unless it shows "that the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support," *Ass'n of Pacific Fisheries v. Environmental Protection Agency,* 615 F.2d 794, 812 (9th Cir. 1980) (citation omitted), or to show that the agency failed to consider all the relevant factors. *Kunaknana,* 742 F.2d at 1152.

Plaintiffs argue that the acknowledged increase in competition from nonsubsistence hunters and local reductions in deer populations constitute, at very least, a threat of significant restriction on subsistence sufficient to trigger the tier-II requirements.[29] The Forest Service disagrees, arguing that competition does not constitute restriction unless demand exceeds supply, which the Service has determined will not occur.[30] The Service further contends that a mere change in subsistence use patterns, such as redirection of subsistence hunting efforts to new locales within the Hoonah area, also does not constitute restriction.[31]

The court finds well-taken the Forest Service's arguments in this regard. Competition and change do not by themselves necessarily constitute significant restriction. The Forest Service has determined that the competition and change caused by the effects of logging and roading under the five year plan will not significantly restrict plaintiffs' subsistence uses and resources. Plaintiffs bear the burden of showing that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2867.

To sustain their burden, plaintiffs have submitted extrarecord affidavits and technical reports evidencing the opinions of several experts that clearcutting and road

---

**29.** Motion at 23, 28, 30, 32, 34, Docket No. 2; Consolidated reply to oppositions to motion for preliminary injunction, filed Aug. 11, 1988 (Docket No. 18) at 7 (hereinafter "Reply").

**30.** Opposition at 18–19, Docket No. 13; FEIS at Vol. I, § 4, at 214, Ex. 34, Docket No. 2.

**31.** *See, e.g.,* Opposition at 17 n. 10, Docket No. 13.

building have already significantly altered and in some cases reduced subsistence uses in particular areas outside of Hoonah, and affidavits and reports of Hoonah residents expressing concern that similar impacts will be felt within the Hoonah area.[32] Plaintiffs have not, however, shown that the agency failed to consider these concerns and opposing views, nor do these conflicting opinions give rise to the spectre that the agency proceeded upon assumptions that were entirely fictional or utterly without scientific support. Consequently, these extrarecord materials are inadmissible to challenge the substantive validity of the agency's FONSR.

Plaintiffs have also submitted, by affidavit, their own percipient testimony that clearcutting and road building around Hoonah has already had "profound impact" on their subsistence activities.[33] The objections applicable to plaintiffs' expert testimony apply *a fortiori* to this extrarecord percipient testimony, and it is therefore inadmissible to challenge the substantive validity of the agency's FONSR.

Plaintiffs' anecdotal evidence is inadmissible to challenge directly the empirical accuracy of the Service's determination that the distances subsistence hunters would have to travel would not be "greatly increased" under the five year plan[34]. Accordingly, the court finds that plaintiffs have shown little likelihood of success on the merits of their claim that the Forest Service's factual findings compel the conclusion that there is a significant possibility that road building and clear cutting under the five-year plan will result in significant restrictions on subsistence.

Plaintiffs have, however, submitted affidavits suggesting a different claim: that clearcutting and road building are forcing Hoonah subsistence users to go farther from their village to successfully kill deer.[35] In their reply to defendants' memoranda in opposition to plaintiffs' motion, plaintiffs argue that the Service acknowledged the possibility of "noticeable local reduction[s] in deer population," but only superficially evaluated the relative importance of specific locales in the Hoonah area for particular subsistence activities.[36] Read in conjunction, these arguments suggest that the Service may have failed adequately to consider some essential characteristics of plaintiffs' manner of harvesting subsistence resources.

The court assumes, without deciding, that a claim that the FONSR is invalid because the Service failed to consider some essential characteristics of plaintiffs' manner of harvesting subsistence resources might lie. At this juncture, however, plaintiffs have not shown a likelihood of success on the merits of such a claim. Plaintiffs' arguments are given only limited development in their motion for preliminary injunction. Furthermore, most of this development is accomplished in plaintiffs' reply memorandum, thus precluding any opportunity for response by the Forest Service.

C. *Cumulative Subsistence Impact.*

Plaintiffs claim that the Forest Service did not include in the FEIS an adequate evaluation of cumulative subsistence impacts of future logging and roading activity, and did not, but should have, complied with the tier-II procedures under ANILCA § 810(a)(1)–(3).[37] The Forest Service asserts that evaluation of cumulative subsistence impact from future as opposed to past or contemporaneous actions is not required, that tier-II procedures are inapposite in

**32.** *See, e.g.,* Motion at 21–32, Docket No. 2 (discussing Exs. 21–28, Docket No. 2).

**33.** Motion at 32–33, Docket No. 2 (discussing plaintiffs' affidavits, Exs. 7–19, Docket No. 2).

**34.** *See* Opposition at 21, Docket No. 13; FEIS at Vol. I, § 4, at 215, Ex. 34, Docket No. 2.

**35.** Motion at 33, Docket No. 2 (discussing plaintiffs' affidavits, Exs. 7–19, Docket No. 2).

**36.** Reply at 6–7, Docket No. 18 (discussing 1985 Subsistence Report at 17–18, Ex. 4, Docket No. 13; 1983 Subsistence Report at 7, Ex. 5, Docket No. 13; Resource Map Overlays for various VCUs at 5–6, Ex. 18, Docket No. 13; 1983 Wildlife Report at 19–20, Ex. 6, Docket No. 13; 1984 Wildlife Report at 4–5, Exhibit 7, Docket No. 13– 5; 1986 Wildlife Report, Ex. 8, Docket No. 13).

**37.** Motion at 35–37, Docket No. 2.

such circumstances, and that the Service's findings here would not, in any case, trigger the ANILCA requirements.[38]

NEPA and its implementing regulations require federal agencies to include an evaluation of a proposed action's cumulative impacts in the EIS prepared for that action. *Save the Yaak Committee v. Block,* 840 F.2d 714, 721 (9th Cir.1988); *Fritiofson v. Alexander,* 772 F.2d 1225, 1243 (5th Cir. 1985); 40 C.F.R. §§ 1508.7, 1508.25(c)(3).[39] Cumulative impact "is the impact on the environment that results from the incremental impact of the action when added to other past, present, *and reasonably foreseeable future actions* regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (emphasis added). The "actions" contributing to the cumulative impact of the proposal that is the subject of the EIS need not themselves be "connected" or "cumulative actions" within the meaning of 40 C.F.R. § 1508.25(a)(1)–(2), nor need they be "proposals" within the meaning of § 1508.23, to be required for impact evaluation in the EIS. *Oregon Natural Resources Council v. Marsh,* 832 F.2d 1489, 1497–98 (9th Cir.1987), *on remand,* 677 F.Supp. 1072 (D.Or.), *cert. granted sub nom. Robertson v. Methow Valley Citi-*

zens Council, 487 U.S. 1217, 108 S.Ct. 2869, 101 L.Ed.2d 905 (1988); *Fritiofson v. Alexander,* 772 F.2d 1225, 1243 (5th Cir. 1985). When cumulative environmental impacts of an action *"may* significantly restrict subsistence uses," NEPA § 102(2)(C) and ANILCA § 810 require the agency to evaluate these cumulative subsistence impacts and to comply with the tier-II procedures specified in ANILCA § 810(a)(1)–(3). *Penfold,* 664 F.Supp. at 1307 (original emphasis; citations omitted), *aff'd* 857 F.2d 1307, 1320–21 (9th Cir.1988).[40]

The Forest Service projected substantial future logging and roading activity in the Hoonah area,[41] and based an extensive evaluation of cumulative environmental impacts on these projections.[42] The Service describes these projections as "relatively fixed" given the "long-term direction provided for in the Tongass Land Management Plan."[43] The Service assessed cumulative impact on deer populations from logging, human population growth and other environmental factors, and predicted that, by the year 2080, deer populations within the Hoonah area will have dropped substantially below the level necessary to meet expected harvest demand.[44]

There is every indication that the future logging activity projected by the Service is "reasonably foreseeable future action" within the meaning of 40 C.F.R. § 1508.7.[45] It is also evident that the predicted short-

---

**38.** Opposition at 25–27, Docket No. 13.

**39.** "[T]he Council on Environmental Quality … regulations are binding on all federal agencies and provide guidance to the courts for interpreting NEPA requirements. 43 Fed.Reg. 55,987 (1978)." *Sierra Club v. Penfold,* 857 F.2d 1307, 1312 n. 9 (9th Cir.1988).

**40.** *See also Kunaknana,* 742 F.2d at 1151. In *Kunaknana,* the court approved a Department of Interior decision-making process that included evaluation of cumulative subsistence impacts and incorporation of mitigation measures "to preclude *future* restrictions on subsistence uses that might be caused" by the proposed action. *Id.* (original emphasis).

**41.** FEIS at Vol. I, § 1, at 1, § 4, at 79, 229–30, 245–48, Ex. 34, Docket No. 2.

**42.** FEIS at Vol. I, § 4, at 229–307, Ex. 34, Docket No. 2.

**43.** FEIS at Vol. I, § 4, at 229, Ex. 34, Docket No. 2.

**44.** FEIS at Vol. I, § 4, at 251–52, Ex. 34, Docket No. 2.

**45.** The court rejects the Service's argument that actions determined to be highly likely to occur are nevertheless not "reasonably foreseeable" within the meaning of NEPA merely because their occurrence is expected to be chronologically remote. *The court notes that while the Service's projections of substantial deer population deficiencies refer to the year 2080, the Service does not indicate when significant effects of such deficiencies will begin to be felt. It seems likely that deer populations expected to be *substantially* deficient by 2080 will become *significantly* deficient sometime beforehand.*

age of deer may significantly restrict subsistence uses. The Forest Service argues, however, that compliance with the tier-II notice and hearing procedures would be superfluous in these circumstances because tier-I compliance is sufficient to produce a detailed evaluation of potential subsistence restriction.[46] The Service also argues that the formal findings required by tier-II would be meaningless where significant restriction can only be expected to result from the cumulative effects of future action.[47]

One purpose of an EIS "is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retai[n] a maximum range of options.'" *Conner v. Burford*, 836 F.2d 1521, 1526–27 (9th Cir. 1988) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir.1983)). The purpose of ANILCA § 810 is:

> to protect Alaskan subsistence resources from unnecessary destruction. Section 810 does not prohibit all federal land use actions which would adversely affect subsistence resources but sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized.

*Amoco Production Co.*, 107 S.Ct. at 1403.

In *Penfold*, this court determined that when cumulative environmental impacts of an action may significantly restrict subsistence uses, agencies must include a cumulative subsistence impact evaluation in the EIS and comply with the tier-II ANILCA procedures. *Penfold*, 664 F.Supp. at 1307 (original emphasis; citations omitted), *aff'd* 857 F.2d 1307, 1320–21 (9th Cir.1988). The Forest Service would have this court limit the holding in *Penfold*, to cases involving cumulative subsistence impact from past or contemporaneous actions, while excluding cases where significant subsistence restric-

tion might result from the cumulative effects of reasonably foreseeable future actions.

The court finds the distinction proposed by the Service to be without rational foundation. The Service's discussion of future subsistence impacts belies the argument that tier-I compliance is sufficient to satisfy the purposes of NEPA and ANILCA, and that tier-II compliance would be "incongruous." [48] The Service, recognizing that an increasing proportion of deer harvest demand would be attributable to non-subsistence hunters, determined that future subsistence impact might be ameliorated by Forest Service road closures and through exercise by the State of Alaska of its regulatory authority over hunting.[49] Compliance with ANILCA § 810(a) would require the Service to:

> (1) giv[e] notice to the appropriate State agency and the appropriate local committees and regional councils ...;
> (2) giv[e] notice of, and hol[d] a hearing in the vicinity of the area involved; and
> (3) determin[e] that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use ... and (C) *reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.*

16 U.S.C. 3120(a)(1)–(3) (emphasis added).

Compliance with the tier-II procedures will enable agency decisionmakers to inform themselves fully regarding restrictions on subsistence use threatened by cumulative impacts of reasonably foreseeable future actions. Tier–II compliance will also enhance prospects for cooperation by interested parties in developing mitigation measures. The court finds no justification for limiting the holding in *Penfold* to cases

---

**46.** Opposition at 26–27, Docket No. 13.

**47.** Opposition at 27, Docket No. 13.

**48.** Opposition at 27, Docket No. 13.

**49.** Opposition at 19–20, Docket No. 13; FEIS at Vol. I, § 4, at 27, 214, Ex. 34, Docket No. 2.

involving cumulative subsistence impacts from past or contemporaneous, but not reasonably foreseeable future actions.[50]

Plaintiffs have shown substantial likelihood of success on the merits of their claim that the Forest Service must evaluate cumulative subsistence impacts in the EIS and comply with ANILCA § 810's tier-II procedures where there is a threat of significant restriction of subsistence uses posed by the effects of the proposed action when combined with those of past, present, or reasonably foreseeable future actions. Further, substantial likelihood of success has been shown with respect to plaintiffs' claim that the declines in deer populations in the Hoonah area predicted in the FEIS constitute such cumulative subsistence impact.

### D. Site–Specificity.

Plaintiffs claim that the FEIS is defective under both NEPA and ANILCA because it does not evaluate impacts upon each cognizable environmental and subsistence value with sufficient geographical specificity, and because it does not correlate the proposed alternatives with the values implicated at each location. Specifically, plaintiffs allege that the evaluations of impacts on deer and on subsistence uses and resources, and the discussions of mitigation measures for these impacts are not adequately site-specific.[51]

The record shows that the Forest Service evaluated and discussed specific wildlife and subsistence impacts upon each Forest Service value control unit (VCU) where data expressed in such geographical units of measurement were available, and upon each Alaska Department of Fish and Game hunt area where the data available were measured only by that standard.[52] These textual discussions of site-specific impacts are supplemented by graphic depictions in maps and overlays, showing the correlation of different types of information for each geographical area. Mitigation measures are discussed for specific types of impact.[53]

The court finds that the plaintiffs have not shown a likelihood of success on the merits of their claim that the environmental and subsistence values addressed in the FEIS and the proposed alternatives considered are not evaluated and discussed with "reasonably thorough" site-specificity. *See California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). At this juncture, plaintiffs have not carried their burden of showing that the impact evaluations and discussions fail to facilitate public discussion of the merits of specific choices among alternatives. *See City of Tenakee Springs v. Courtright,* No. J86–024, slip op. at 10 (D. Alaska June 26, 1987) (*Tenakee II*). Plaintiffs' suggestions that the FEIS does not correlate impacts with particular subsistence use areas does nothing to advance their site-specificity challenge, nor are these suggestions sufficiently developed or supported to make out a claim that the Service has failed to consider relevant factors. Similarly, plaintiffs' allusions to criticisms raised by the Alaska Division of

**50.** The Service, as the delegate of the Secretary of Agriculture who is charged with the duty to implement ANILCA, also argues that its interpretation of section 810 is "reasonable," and accordingly must be deferred to by this court. Opposition at 25, Docket No. 13. In the first instance, the Service's construction conflicts with that of the Secretary of Interior, previously endorsed by the court in *Kunaknana,* 742 F.2d at 1151, and confirmed as a matter of law in *Penfold,* 664 F.Supp. at 1307. Deference is inappropriate because "the intent of Congress is clear" that federal agencies having primary jurisdiction over public lands in Alaska have a duty to consider cumulative subsistence impacts under NEPA and ANILCA, and to comply with tier-II procedures where such impacts may significantly restrict subsistence uses. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). Further, the court finds that the Service's construction is unreasonable in any event.

**51.** Motion at 40–41, Docket No. 2.

**52.** *See, e.g.,* 1985 Subsistence Report, Ex. 4, Docket No. 13; 1983 Subsistence Report, Ex. 5, Docket No. 13; 1983 Wildlife Report, Ex. 6, Docket No. 13; 1984 Wildlife Report, Exhibit 7, Docket No 13– 5; 1986 Wildlife Report, Ex. 8, Docket No. 13; FEIS at Vol. I, § 4, at 12–27, 173–74, 178, Ex. 34, Docket No. 2.

**53.** FEIS at Vol. I, § 2, at 66–82, Ex. 34, Docket No. 2.

Subsistence and The Wildlife Society[54] do not implicate the site-specificity of the FEIS.

### E. Consideration of a No–Action Alternative.

The APC Contract sets parameters for the amount of timber to be harvested during each five-year operating period.[55] Roading and logging authorized in a five-year plan but not actually completed during that period are provided by the contract to be automatically "carried over" for completion during the subsequent five-year period.[56]

NEPA requires agencies proposing major federal actions to consider a "no action" alternative in the EIS. 40 C.F.R. §§ 1502.-14(d), 1508.25(b)(1). The no-action alternative that the Forest Service considered for the 1986–90 period carries over the logging and roading that was authorized but not completed in previous periods.[57] While the no-action alternative authorizes no new logging or roading, it calls for carryover harvesting of 253 million board feet of timber through logging and roading in 17 of the 52 VCUs in the study area during the five-year period.[58]

Plaintiffs attack the no-action alternative considered by the Service because it involves logging or roading in all but one of the VCUs in the Hoonah area.[59] Plaintiffs maintain that the Service is required by NEPA to evaluate and discuss an alternative that involves no logging or roading at all.[60]

Plaintiffs cite the holdings in *Tenakee I*, 778 F.2d at 1410 (Skopil concurring), and *Tenakee II*, slip op. at 10, for the proposition that total suspension of logging and roading activity within the sale area for the five-year period covered by the site-specific EIS remains a cognizable no-action alternative within the meaning of NEPA. The Forest Service does not directly rebut this argument, but instead asserts that outright suspension of activity is not a cognizable alternative because the contract prescribes a certain volume of harvesting for each five-year period and specifies that unfinished harvesting may continue without reauthorization during a subsequent period.

The Forest Service relies on *Natural Resources Defense Council, Inc. v. Hodel*, 624 F.Supp. 1045, 1054 (D.Nev.1985), *aff'd*, 819 F.2d 927 (9th Cir.1987), for the proposition that "no-action" means continuation of the status quo ante—in this case, continuation of carryover activity—in the absence of any proposed *new* action.[61] Plaintiffs, on the other hand, argue that *Natural Resources Defense Council* is distinguishable from the case at bar.[62]

Plaintiffs correctly note that the NEPA document at issue in *Natural Resources Defense Council* was a programmatic, rather than site-specific, range management EIS.[63] The court in *Natural Resources Defense Council* also emphasized that cessation of all grazing activity would have contravened a statutory mandate.[64]

---

**54.** Reply at 8, 18 n. 25, Docket No. 18.

**55.** Contract § 5(c), FEIS at Vol. III, § A, at 17–18; Vol. I, § 1, at 5, Ex. 34, Docket No. 2.

**56.** Contract § 7a, FEIS at Vol. III, § A, at 22–24; Vol. I, § 3, at 17, Ex. 34, Docket No. 2.

**57.** Opposition at 28–30, Docket No. 13.

**58.** FEIS at Vol. I, § 2, at 10, Ex. 34, Docket No. 2.

**59.** Motion at 39, Docket No. 2.

**60.** A literal construction of plaintiffs' arguments might suggest that they object only to the Service's failure to consider suspension of activity in specific VCUs of particular significance to plaintiffs. Motion at 38–39, Docket No. 2. The

court sees no merit in the extraordinary proposition that the Service must consider an individual no-action alternative for each VCU in the sale area, and assumes that plaintiffs have focused their argument on these VCUs to emphasize the putative injury to plaintiffs' interests caused by the Service's definition of "no-action."

**61.** Opposition at 29–30, Docket No. 13.

**62.** Reply at 15–16, Docket No. 18 (discussing *Natural Resources Defense Council, Inc. v. Hodel*, 624 F.Supp. at 1054).

**63.** *Natural Resources Defense Council*, 624 F.Supp. at 1054.

**64.** *Id.*

In the case at bar, the EIS is site-specific. Furthermore, the Service's ability to suspend activity during an operating period is complicated only by contractual obligations; the Service has not shown that its authority to suspend harvesting is circumscribed by law.[65]

At this juncture, plaintiffs seem correct in their assertion that NEPA requires the Forest Service to consider in the EIS a no-action alternative involving suspension of harvest activity. The Service, on the other hand, has not shown why such a requirement should not apply. Accordingly, the court finds that plaintiffs have shown a likelihood of success on the merits of their claim that the Service failed properly to consider a no-action alternative in the FEIS. Adverse economic or environmental consequences of such a no-action alternative, including any that might result from violation of contractual obligations, should be evaluated and discussed in the EIS like those of any other alternative considered.

### F. *Supplemental Evaluation of Carryover Logging.*

A significant portion of the logging approved for the Hoonah area during 1981–86 was not completed during that period, and was "carried over" for completion during the 1986–90 period.[66] On January 4, 1985, the Service and APC reached an agreement "delet[ing] or deferr[ing] about half of the total harvest for the APC contract area."[67] In a previous action challenging the FEIS for the 1981–86 operating plan, this court determined that "this change is of such magnitude that it could affect … the decision on whether and how to proceed with the project,"[68] and that the Service was consequently required by NEPA to prepare a supplemental EIS regarding the changes.[69]

The Service concedes that the impacts of previously authorized and subsequently carried over activity have been treated as a *"fait accompli"* in the 1986 FEIS.[70] Because these impacts were considered initially in the 1981 FEIS, the Service gave them only cursory evaluation and limited discussion in the 1986 FEIS, and further described the impacts in the past tense despite the fact that the bulk of the activity has not yet commenced.[71] Plaintiffs claim that the Service's treatment of the impacts of carryover logging and roading in the 1986 FEIS violates NEPA.[72] The court finds that plaintiffs have shown a likelihood of success on the merits of this claim.

### IV. REMEDIES.

Plaintiffs are seeking a preliminary injunction prohibiting the Forest Service during the pendency of this litigation from permitting any timber cutting or road building in specified VCUs within the Hoonah area, while allowing the Service to permit yarding of felled timber and other measures necessary to make windfirm those harvest units that already have been entered.[73] The court has determined that plaintiffs have failed to show a likelihood of success on the merits of two of their claims: (1) that the Service could have no

---

**65.** Nor is it clear that such a showing would excuse the Service from including a true no-action alternative in the FEIS. *See* Council on Environmental Quality, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed.Reg. 18026, 18027 (March 23, 1981) ("the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act").

**66.** FEIS at Vol. I, § 3, at 17; Vol. III, App. B; Map Vol., Alt. J, Ex. 34, Docket No. 2.

**67.** *Tenakee II,* slip op. at 9.

**68.** *Id.* (citing *Thomas v. Peterson,* 753 F.2d 754, 760 (9th Cir.1985)).

**69.** *Id.* (citing 40 C.F.R. 1502.9(c)(1); *SOCATS v. Clark,* 720 F.2d 1475, 1480 (9th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984)).

**70.** Opposition at 38, Docket No. 13; FEIS at Vol. I, § 3, at 17, Ex. 34, Docket No. 2.

**71.** FEIS at Vol. I, § 4, at 59–67, Ex. 34, Docket No. 2.

**72.** Motion at 42, Docket No. 2.

**73.** Motion for preliminary injunction, filed July 21, 1988 (Docket No. 2) at 2; Reply at 26, Docket No. 18.

reasonable basis for concluding that the direct and indirect effects of the 1986 five-year operating plan would not significantly restrict subsistence uses, and (2) that those environmental and subsistence values which are addressed in the FEIS, and the proposed alternatives considered there, are not evaluated and discussed with "reasonably thorough" site-specificity. Plaintiffs have, however, shown a near certainty of success on the merits of their claim that (3) the Service's FONSR incorporates the wrong legal standard. Further, plaintiffs have shown a strong likelihood of success on the merits of their claim that (4) the Service must evaluate in the FEIS the cumulative subsistence impacts of reasonably foreseeable future reductions in deer populations, and must comply with ANILCA § 810's tier-II procedures with respect to those cumulative impacts. Plaintiffs also have shown a likelihood of success on the merits of their claims that (5) the Service failed properly to consider a no-action alternative in the FEIS, and that (6) the Service failed properly to supplement the evaluation and discussion of impacts of carryover logging and roading in the 1986 FEIS.

As the court noted earlier, once it has been determined that plaintiffs have made the requisite showing of likelihood of success on the merits of their claims, the court must consider the likelihood of irreparable injury if injunctive relief is denied, and must balance the harms to each party that would result from granting or denying such relief. *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987); *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987); *Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir.1988).

In *Amoco Production Co.*, the Supreme Court reversed a Court of Appeals judgment reversing this court's decision not to grant a preliminary injunction for a federal agency's violation of section 810(a) of AN-ILCA. 107 S.Ct. at 1409. The Court declared that the mere grant of jurisdiction to ensure compliance with a statute does not, by itself, abrogate the court's traditional equitable discretion. Accordingly, a court under appropriate circumstances may decline to enjoin a violation of a statute unless that statute, by its language or by "necessary and inescapable inference," restricts the court's jurisdiction in equity. *Id.* at 1402–03 (citations omitted). The Court determined that ANILCA was not such a statute. *Id.* at 1403.

The Court characterized section 810(a) as a statutory provision that imposes procedural obligations in order to promote environmental values, and identified the factors governing the exercise of equitable discretion by a court considering whether to enjoin agency action undertaken in violation of those procedural obligations. *Id.* In such cases, the reviewing court must first identify the "underlying substantive policy" that the statutory procedures were designed to effect. *Id.* Then the court must determine the probability that the agency's unlawful action will "undermine this policy." *Id.*

The Court held that the purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction. *Id.* Finding that this court had "expressly found that exploration activities would not significantly restrict subsistence uses" and, accordingly, that "injury to subsistence resources from exploration was *not at all probable*," the Court held that the Ninth Circuit had erred in directing issuance of a preliminary injunction. *Id.* at 1403–05 (emphasis added). The Court noted, however, that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is *sufficiently likely*, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 1404 (emphasis added).

While plaintiffs have shown a likelihood of success on the merits of several of their claims in this case, they have not shown that injury to the environmental values underlying their subsistence interests is sufficiently likely, nor that the balance of harm tips sufficiently in their favor, to qualify for the preliminary injunctive relief they seek. Plaintiffs evidence reveals a possibility that harvesting activity in areas outside

of Hoonah has caused increased hunting competition and changed subsistence use patterns there.[74] Plaintiffs have also produced evidence of concern among Hoonah residents and others that increased competition and changes in use patterns are taking place in the Hoonah area as well.[75]

Plaintiffs have not shown, however, that evidence of impacts in other areas is generalizable to conditions that may result in the Hoonah area. Plaintiffs further have failed to show that hunting competition or changes in subsistence use patterns may cause *restriction* of subsistence uses or resources in the Hoonah area, a concept which is qualitative as well as quantitative. Finally, plaintiffs have not made a particularized showing of the quantity and quality of subsistence interests and timber-harvest interests implicated in each VCU. Without such proof, it is unclear whether environmental benefits might result from enjoining particular activities in particular VCUs, nor is the court able to fashion injunctive relief that is sufficiently narrowly tailored to avoid unduly skewing the balance of hardships to the detriment of third-parties like APC and the timber dependent communities of southeastern Alaska.

Plaintiffs, defendant Forest Service, and intervenor-defendant APC are equally guilty of engaging only in worst-case quantification of harms in their moving papers. Plaintiffs' evidence does not discuss the degree of clearcutting and road building that must occur before a threat of significant subsistence restriction results. The Forest Service and APC, on the other hand, have submitted evidence tending to show only that the economic effects of an outright prohibition of all harvesting in the Hoonah area would be catastrophic for the local timber industry and the communities that depend upon it.[76] If the plaintiffs are correct in their assertion that harvesting under the 1986 operating plan may result in significant restriction of subsistence uses, it is likely that neither complete suspension of harvesting nor unrestricted continuation of such activity would be appropriate pending the Forest Service's compliance with its obligations under NEPA and ANILCA.

The court suggests to all parties in this litigation that the formulation of terms for injunctive relief pending the Service's compliance with its statutory obligations would best be accomplished through the process of compromise among the parties. In *Tenakee II*, this court urged the parties to compromise similar claims brought by the plaintiffs in that litigation in such a way as to 1) keep APC and the principle southeastern mills in business; 2) minimize environmental harm pending completion of supplemental environmental studies; and 3) keep as many options open as possible with respect to later road building and harvests, so that the supplemental studies can consider a broad range of alternatives.[77] In addition, the court noted that proper balancing of the equities requires consideration of the potential contract-wide economic consequences of injunctive relief.[78] The court reemphasizes these admonitions here.

Accordingly, IT IS ORDERED:

THAT plaintiffs' motion for preliminary injunction, filed July 21, 1988 (Docket No 2), is denied.

---

**74.** *See* Motion at 24–25, Docket No. 2. The court notes that plaintiffs' extrarecord evidence, while inadmissible to challenge the substantive veracity of the Service's findings, is admissible to show a possibility of irreparable injury.

**75.** *See* Motion at 25–28, Docket No. 2. *See also* note 32, *supra,* and accompanying text.

**76.** *See, e.g.,* Intervenor at 13–14, 19, Docket No. 15. The court reminds APC that "pecuniary injury [to defendants] is not an adequate basis for denying injunctive relief" where plaintiffs show a sufficient likelihood of environmental injury. *See People ex rel. Van de Kamp v. Marsh,* 687 F.Supp. 495, 501 (N.D.Cal.1988), citing *People ex rel. Van de Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1316, 1319 (9th Cir.1985); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).

**77.** *City of Tenakee Springs v. Courtright,* No. J86–024, Memorandum and Order entered July 31, 1987 (per M.O. fld 10/13/89, docket # 47) at 2–3 (D.Alaska).

**78.** *Id.* at 4.